Catholic Benevolent Legion v. Murphy.

THE SUPREME COUNCIL CATHOLIC BENEVOLENT LEGION

·v.

KATE MURPHY and MARY J. BAUER.

[Submitted July 11th, 1903. Decided July 24th, 1903. Filed
January 5th, 1904, as of October 19th, 1903.]

1. One insured in a beneficial association in favor of his wife, who had possession of the certificate, told her, after it had lapsed and he had ceased to have any income or property, if she would get it reinstated and continue the payments she should have the benefit of the certificate. This she did; also supporting him, though he was able to support himself, but for his habit of drinking. At this time the by-laws of the association allowed a change of beneficiary only on surrender of the certificate. Afterwards, under a by-law thereafter passed, allowing such change without such surrender, in case the certificate is beyond the member's control, he attempted to make a change in favor of a sister, who had made some slight, gratuitous gifts to him of spending-money.—*Held*, on an interpleader by the association, which paid the money into court, that the wife's equity was so strong that it could not be overcome, even if the designation of a new beneficiary was made by him of his free will, and was carried out with the technicalities necessary to make the new certificate effective.

2. Under a by-law of a beneficial association allowing change of beneficiary only on surrender of the certificate, except that where the certificate is lost or beyond the member's control, he may have a change, on a request accompanied by an affidavit setting forth the facts of the loss or how the certificate is beyond his control, where the member voluntarily gave the certificate to his wife, the beneficiary, and made no demand on her for it, his affidavit, prepared by his sister, when his mind was weakened by liquor, stating that the certificate was beyond his control; that his wife had obtained possession of it and refused to deliver it to him, though requested to do so, and that he had not for a long time been living with her, when he had been continuously living with her, receiving support from her for five or six years, is insufficient to support a new certificate designating the sister as beneficiary.

3. Where a beneficial association pays the insurance into court, and interpleads the persons claiming it, the court may award it on equitable principles and in accordance with the real wishes of decedent, without regard to technical defences which the association might have had to either of them.

On bill of interpleader. Final hearing on issue made up between the defendants, Kate Murphy and Mary J. Bauer.

Catholic Benevolent Legion *v.* Murphy.

This is a suit of interpleader. The contest is over a sum of $1,000, deposited in the court by the complainant as part—one-half—of the money due under a certificate called a benefit certificate issued by the complainant to John J. Murphy, the husband of the defendant Kate Murphy and the brother of the defendant Mrs. Bauer.

The certificate is dated March 9th, 1888, and is issued to John J. Murphy, as a member of Paulus Hook Council, No. 183, of the Catholic Benevolent Legion, at Jersey City. This Paulus Hook council is a council subordinate to the complainant. The domicile of the complainant is Brooklyn, in the State of New York.

The important part of the certificate is as follows:

"These conditions being complied with, the Supreme Council Catholic Benevolent Legion hereby agrees to pay out of its benefit fund to Kate Murphy—wife—a sum of money not exceeding two thousand dollars, according to the provisions of law governing said fund, upon the death of said member in good standing, provided he shall not have substituted another beneficiary or reduced the amount of said benefit under the rules governing disability benefits."

This certificate bears the seal of the supreme council, complainant, and the lithographed signatures of John D. Carroll, the supreme secretary, and John C. McGuire, the supreme president. It also has the actual signature of John J. Murphy, following the words "Witnessed and delivered in our presence," and the seal of the Paulus Hook council and the actual signature of Peter Byrne, president, and H. T. J. Moran, secretary of the Paulus Hook council.

As throwing light on this mode of attesting the certificate issued by the complainant is section 3 of chapter 2 of the laws of the legion:

"A member in good standing may at any time surrender his benefit certificate to the secretary of his council for change of beneficiary, and have a new one issued payable to such legal beneficiary or beneficiaries as he may direct, as provided in the foregoing section, upon the payment of a certificate fee of fifty cents. The right to receive the benefit will vest in the new beneficiary or beneficiaries named in this application as soon as endorsed over his signature on the benefit certificate, duly attested by two witnesses, one of whom must be a member of the legion."

This certificate, which was numbered 15,359, was, as soon as received by the member, handed by him to his wife, the defendant Kate Murphy, the beneficiary therein named, and retained in her possession (with the exception of one or two months in the summer of 1901) until the death of her husband, which occurred on the 9th of March, 1902. With the certificate was handed to Murphy a pass-book or books, in which were entered the charges for assessments and dues both in the supreme council and in the local council, and his payments were credited thereon as made.

Murphy kept his payments up until some time in the year 1897, when he fell in arrears. Indeed, some of the last payments were made by a friend. The policy thereby became lapsed, whereupon he handed the pass-books to his wife and asked her to repay the amount advanced by his friend, and said that if the complainant would reinstate him she should continue the payments and that she should have the benefit of the certificate. His wife accepted the pass-books, repaid his friend the amount advanced by him; the complainant waived the lapse, accepted payments from her, and she kept up such payments until the death of her husband, March 9th, 1902. She also, during that period, supported him, without any aid from him. They never had any children.

On February 11th, 1902, Murphy, being quite sick from the combined effects of tuberculosis and the excessive use of alcoholic stimulants, and temporarily stopping at the house of his sister, Mrs. Bauer, who lived with another sister, Mrs. Brock, and her mother, Mrs. Murphy, made an affidavit wherein he identified himself as the person named in the certificate above mentioned, and stated that the policy of insurance or certificate in question was beyond his control, and had been since the month of September, 1901; that he was not then, nor for a long time had been, living with his wife; that his wife had obtained control of the insurance policy, and had refused to deliver the same to him, although requested so to do. This affidavit was essentially untrue. He had been continuously, up to within ten days previous to that time, living with his wife, and had been for five of six years supported by

her.   The so-called policy had been in his possession for a few weeks during the previous summer of 1901, but had been voluntarily returned by him to his wife, and he had made no demand on her for it.

The affidavit was made for the purpose of complying with the terms of a new rule or by-law adopted by the complainant in the summer of 1901.   Previous to that by-law of 1901 a new beneficiary could not be named except by the surrender of the previous certificate and the issuing of a new one.   That by-law was an addition to section 3, above quoted, and is in these words:

"In case a benefit certificate is lost or beyond a member's control, the member may, by a written request, witnessed as required by this section, and stating in writing that all claims under the former benefit certificate are surrendered, and requesting that a new certificate be issued to him payable to the same or a new beneficiary or beneficiaries, in accordance with the laws of the legion, and accompanied by an affidavit *setting forth the facts of the loss of the former certificate, or how such certificate is beyond the member's control*, which affidavit shall be in form satisfactory to the supreme secretary and accompanied by a fee of fifty cents.   Thereupon the supreme secretary shall issue to such member a new certificate, payable to the beneficiaries as requested."

On the 12th of February he executed, in the presence of his counsel, Mr. Melosh, and of John F. Murphy, secretary of the Paulus Hook council of the Catholic Benevolent Legion, a paper, as follows:

"*To the officers and members of Paulus Hook Council, No. 183, Catholic Benevolent Legion, of Jersey City, N. J.:*
. "I hereby surrender all claims and demands which I may have against Paulus Hook Council, No. 183, Catholic Benevolent Legion, or against the Supreme Council of the Catholic Benevolent Legion, which I, or my beneficiaries may have against them under and by virtue of the terms and provisions of benefit certificate No. 15,359; and I request that a new certificate be issued to me, in lieu of the certificate before mentioned, payable upon my death to my wife, Kate Murphy, one-half, to wit, the sum of one thousand dollars, to my sister, Mary A. Bauer, the remaining one-half, or one thousand dollars.

"JOHN MURPHY.

"Dated February 12th, A. D. 1902.
"Witness:
    "HENRY J. MELOSH,
    "JOHN F. MURPHY."

Acting upon the strength of this paper and the affidavit above mentioned, the complainant issued a new certificate, bearing the same number, 15,359, to John J. Murphy, and in the course of three or four days it came, in due course of business, into the hands of John F. Murphy, the secretary of the Paulus Hook council, but it never passed out of his hands, and it was never sealed with the seal of the Paulus Hook council, nor delivered to John J. Murphy and accepted by him, or witnessed by the president and secretary of said council. That new certificate bore the seal of the superior council and the lithographed signatures of the president and supreme secretary, and, by its terms, the agreement was to pay to Kate Murphy, wife, and Mary A. Bauer, sister, $2,000, one-half to each.

The next day, February 13th, John J. Murphy was removed to his own home by his wife, and the same afternoon made two other affidavits and executed another paper, which, if it had been executed in the presence of the proper officer of the local council and approved by the complainant, would have been effectual, according to its rules, to reinvest the wife with the title to the whole fund. This was never done. These papers were as follows:

"STATE OF NEW JERSEY, } ss.
  "COUNTY OF HUDSON. }

"John J. Murphy being by me duly sworn on his oath doth depose and say that he has a certain benefit certificate in the Catholic Benevolent Legion, issued to him, payable to his wife; that on or about February 12th, 1902, his sister, Mary Bauer, obtained from him, while he was under the influence of some drink or drug and under threat, some papers, which he has been informed, and believes to be, an application for the change of beneficiary from his said wife, Kate, to his sister, Mrs. Mary Bauer; that it is his request, and he hereby demands, that said papers, which he signed, be returned to his said wife or himself; that he does not desire that the beneficiary be changed to any other person; that his said wife is entitled to have the said monies due under said certificate and that it is his request that they return whatever papers he signed.

"JOHN MURPHY.

"Sworn and subscribed before me this 13 day of February, 1902.
"F. V. MANY,
"Master in Chancery of New Jersey."

"State of New Jersey, ⎱
 "County of Hudson. ⎰ *ss.*

"John J. Murphy being by me duly sworn upon his oath doth depose and say, that on or about twelfth day of February, nineteen hundred and two, he signed an application on some paper, purporting to be an application to the Catholic Benevolent Legion for the change of beneficiary in a certain policy of insurance issued to me and payable to my wife, Kate Murphy; that said application and affidavit was obtained from me while under the influence of some drink or drug and under threat and fear of my sister, Mrs. Mary Bauer; that he believes said Mary Bauer is now in possession of said papers or a new policy issued to her, and that she refused to give them to him; that it is desire that said policy as originally issued to him, payable to his wife, Kate, shall not be changed to any other person, and he hereby requests that if a new policy has been issued to any other person that a new certificate be issued to him, payable to his said wife, Kate Murphy.

"John J. Murphy.

"Sworn and subscribed to before me this 13 day of February, A. D. 1902.

"Francis V. Many,
"*Master in Chancery of New Jersey.*"

"Jersey City, N. J., February 13, '02.

"*To the officers and members of Paulus Hook, No. 183, Council C. B. L.:*

"Comrades—I hereby surrender my benefit certificate No. 15,359, to be forwarded to the Supreme Council C. B. L., with the request that a new one be issued changing my beneficiary to Kate Murphy.

"John J. Murphy.

"Witness present:
 "F. V. Many."

On the 15th of February he executed a testamentary writing, as follows:

"In the name of God, Amen. I, John J. Murphy, being of sound and disposing mind, do make, publish and declare this to be my last will and testament.

"*First*, I give, devise and bequeath to my wife, Kate Murphy, all my property of whatever kind and description; I also give to my said wife, Kate Murphy, whatever interest I may have in a certain policy or certificate for two thousand dollars issued to me by the Catholic Benevolent Legion; my wife having paid all the premiums and assessments under the said policy for at least six years, and I having given the said policy or certificate to her with the understanding that if she would pay the said premiums, the said policy or certificate in the said Catholic Benevolent Legion would be hers absolutely, the said premiums having been paid by her out of her own monies, it is my intention that if I now have any interest therein that such interest be vested in her; it is my intention

and request that she should have the said two thousand dollars under said policy.

"*Second,* I hereby appoint my said wife, Kate Murphy, executrix of this last will and testament and direct that no bond be required of her as such executrix.

"In witness whereof I have hereunto set my hand and seal this 15th day of February, A. D. 1902.

"Signed, sealed, published and declared by the said testator to be his last Will and Testament in the presence of us who at his request and in his presence and in the presence of each other have hereunto signed our names as subscribing witnesses.

"JOHN MURPHY.

"GEORGE W. RURODE, 1 Exchange Pl., Jersey City.
"MARTIN RIELLY, 14 Sussex Pl. Jersey City.
"WILLIAM CORNELL, JR., 14 Sussex Pl., Jersey City.
"MAMIE WRIGHT, 14 Sussex Place."

A mass of evidence was given as to the condition and habits of the deceased during the last six or seven years of his life, and longer, and also as to his mental condition between the 1st of February and the time of his death.

The evidence on behalf of his wife tended to show that he was, and had been for many years, a steady drinker of intoxicants, and had indulged to such an extent that, at the last, if he was not supplied with a certain amount of stimulants, he was liable to fall into delirium tremens, and was, in fact, very weak in mind and easily influenced and persuaded; that he died of alcoholic neuritis, or wearing out of the nervous system, as the result of long-continued over-stimulation, accompanied by tuberculosis.

On the part of the sister the evidence tended to prove that he was of sound mind, but afflicted with tuberculosis, which caused his death.

The evidence clearly established the fact that, from the day of the visit to the house of his mother and sisters, February 2d, 1902, until his death, on the 9th of March, he was, quite properly, kept constantly under the influence of stimulants, and that while at his sister's the attending physician prescribed and there was administered to him doses of an opiate.

The evidence also shows that neither of the papers signed by him were prepared from personal direction taken from him,

Catholic Benevolent Legion *v.* Murphy.

with a single exception. The evidence shows that his sister Mrs. Bauer employed Mr. Melosh to prepare the papers changing the certificate in her favor, and that he prepared the affidavit verified before him from her instruction. The same is true with regard to the affidavits taken by Mr. Many. Those were prepared by Mrs. Murphy's counsel, Mr. Rurode, from statements made to him by Mrs. Murphy.

The single exception is that the latter part of the new surrender and designation executed February 12th, in the presence of the secretary of the local legion, wherein he specifies that his wife, Kate Murphy, was to have one-half, viz., the sum of $1,000, and his sister Mary A. Bauer the remaining $1,000, was written in by his bedside. The evidence of Mr. Melosh is that he was willing and desirous to give the whole to his sister, but that he (Melosh) reasoned with him upon the inequity of such disposition, and induced him to divide it between his wife and sister.

*Mr. Marshall W. Van Winkle,* for Mrs. Murphy.

*Mr. Louis G. Morten,* for Mrs. Bauer.

PITNEY, V. C.

There are two aspects of the law applicable to this case. One which holds that the rules of the complainant society regulating the making of new designations of beneficiaries applies and controls the rights of the parties, although the society has paid the money into court, thereby, as held in many adjudged cases, waiving all defences which it might have made to a claim preferred by any particular party based on a failure to comply with those rules.

The other aspect is that the rules and regulations just mentioned are made wholly for the benefit of the association, to protect it against uncertain claims and to enable it to pay the money with safety to a particular individual, and that they have no force and effect as between divers adverse claimants, except to aid in ascertaining intention.

The former rule seems to have been adopted and acted upon

by Vice-Chancellor Grey in the very recent case of *Grand Lodge* v. *Gandy, 18 Dick. Ch. Rep. 692.*

The latter rule was applied by the supreme court of Pennsylvania in the quite recent cases of *Pennsylvania Railroad Co.* v. *Wolf, 52 Atl. Rep. 247,* and of *Schomaker* v. *Schwebel, 54 Atl. Rep. 337.*

Without at this time considering the merits of the rules in question and the extent of their application, I think it quite safe to affirm that no rule, however reasonable in itself or thoroughly imbedded in the contract or useful in general application, can stand in the way or stay the effect of the operation of the fundamental principles of equity.

I will first consider the case as if the last designation made by the deceased on February 13th and that made in his will in favor of his wife were ineffectual, and consider the strength of the wife's position independent of that designation and independent of her contention that her husband was so far incompetent and so completely under the influence of his mother and sisters when, on February 12th, he executed the designation in favor of his sister as to render that instrument invalid and ineffectual to warrant the issuing of the new certificate.

At the time in 1897 that the deceased delivered the passbooks to his wife, with a request that she should revive the policy and keep it alive, with the promise that she should continue to be the beneficiary therein named, he had stopped business and had no income, and had become incapable, by reason of his habits and disposition, to earn a living either for himself or his wife; and she took up the burden of furnishing that living, both for herself and her husband, and, by very hard labor in keeping a boarding-house for young men, supported him from that time on until his death in decency and comfort. She also, with her own money, earned with her own hands, paid the monthly dues and assessments to the complainant and the quarterly and other dues due to the Paulus Hook council. When she commenced such payments he was still a comparatively young man, with a prospect, but for his drinking habit, of living many years, and of that prospect of life she took the chances. She might be obliged to continue payments and his

support for many years. The fact that he died so soon, whereby her payments aggregated a comparatively small sum, and the fact that she was obliged to support him but for only a few years, does not detract from the merit of her position. The same principle applies that would apply if her payments and support had commenced many years earlier and had continued many years longer.

At the time she commenced payments and the support of her husband, as the by-laws of the society then stood, the actual possession of the certificate, or policy, as it was called, was, on the present hypothesis, an absolute protection against any change in the beneficiary: This was admitted by counsel for Mrs. Bauer. Without the production and surrender of the certificate itself the husband could not exercise the only absolute right he had in the certificate, viz., the power to change the beneficiary.

In this situation the question arises, was it competent for the complainant society to so change its rules and by-laws as to affect the wife's right and enable the husband, as against her, to change the beneficiary?

I think there can be but one answer to this question. The transaction referred to between the husband and wife, when acted upon, as it was, by the wife, amounted to an irrevocable waiver by him in her favor of his right to exercise the power of change of designation. It operated, in equity, as a release of such power to her. Her right became vested by reason of her payments and the support which she furnished him, and it was not competent for the complainant, by a change of rules, to enable her husband to divest them, or, rather, it was not competent for the husband to take advantage of such change of rules for that purpose.

It seems to me that citation of authority in support of this position is unnecessary. It has been held that, not only is the legislature incapable of destroying vested rights by subsequent legislation, but the people, in their supreme power, may not do it, even by change in the constitution.

It is a familiar rule, well settled in this state, that the reservation by the legislature of the right to alter and amend charters of incorporated companies must be confined to altering that

part of the charter which consists of the legislative grant to the corporation, and cannot be extended to altering that part of the charter which constitutes the contract between the stockholders.

In this case, if the wife, by the continued possession of the certificate, under claim of right, with the consent of her husband and the continued payment of the monthly and quarterly dues thereon, and by her continued support of her husband in anticipation of receiving the benefit of the certificate, acquired an equity in the fund created thereby, no act of her husband, based on any new rule adopted by the complainant association or anybody in any other manner, can deprive her of that right.

I am of the opinion, therefore, that if the case stopped just here the wife, in the absence of any countervailing equity on the part of the sister, would be entitled to the fund.

But the question arises whether the new certificate, filled up and issued in blank by the superior council and sent down to the local council for delivery, but never delivered to the deceased, ever became binding on complainant, and superseded the original certificate, so that the complainant could have been successfully sued thereon by the beneficiaries therein named. It seems to be a part of the general scheme of these councils, which has not been repealed by the new by-law of 1901, that the new certificate does not become binding until certain formalities have been complied with by the assured and the officers of the local council—that is, the assured must accept the policy and the local council must affix thereto its seal and the acceptance by the assured must be witnessed by the president and secretary of the local council. This was never done with the new certificate here.

It may be admitted, however, that if the assured did everything in his power to make the change, and it was not fully carried out, either by reason of want of time on the part of the supreme council and the local council, or by refusal on their part so to do, the right of the new beneficiary could not be affected thereby, but he or she would be entitled to the money. I have so held in an unreported case, and there are reported cases in other jurisdictions to the same effect.

This brings us to the consideration of the circumstances preceding and attending the execution of the various papers, above set forth, and the influences which prevented the consummation of the formalities required on the face of the new certificate.

The parties were married in 1886, and always lived in Jersey City. At that time deceased was about twenty-eight years old and his wife was apparently of a corresponding age. As far as appears he had no pecuniary means, but she had saved a considerable sum of money—$1,000, she swears—from her earnings in a publishing-house. This she gave to him and set him up in the business of a drinking saloon.

He conducted this drinking saloon and supported his wife, in the ordinary way, until about 1896, when he was obliged, by the decline of his business, to sell it, and he, from that time, became substantially unable to support either himself or his wife.

She shortly afterwards, with the assistance of her niece, a Miss Wright, established a boarding-house, and carried it on until his death, laboring with her own hands, and having only the assistance of her niece and the help occasionally of a washerwoman. Thereby she was enabled to support herself and her husband in comfort.

Her boarders consisted entirely of young men. Those of them who appeared on the stand seemed to be of a decent and respectable sort.

Her husband had acquired the drink habit, and also a taste to play the gentleman and lounge about hotels and drinking saloons.

From that time until he died the only work he did was to serve as a bartender and assistant in a restaurant for a few months, and also one term as a juryman. No part of the proceeds of such service, so far as appears, ever came to the hands of his wife.

At the time of his stopping business he was possessed of some valuable jewelry, watch, chain, &c., and, I infer, a good stock of clothing. He managed to keep up a gentlemanly and tidy appearance in the matter of clothes, and was fond of frequenting drinking saloons. The drink habit increased upon him,

and he often came home at night drunk and always more or less under the influence of liquor.

His wife swears that he received over $100, over and above his debts, from the sale of his drinking saloon, and gave it to her. Shortly afterwards he reclaimed it, and stayed away from home, at a hotel, for two or three weeks, until it was all spent, and, as he told her, most of it was gambled away.

Naturally his principal difficulty was to keep up his appearance in the matter of clothing and have a little money in his pocket to do his part in the matter of drinks among his boon companions. His wife furnished him with very little money directly, and in this she was entirely justified. But she did give him a good home, good food and good attention, and she furnished him with all his underclothing and did his washing, but abstained from furnishing him with outer clothing, because, as she swears, she knew he had his jewelry of considerable value and was selling it from time to time, and she thought he might as well buy his outer clothing with that as to spend it, as she knew he would, for drink. Perhaps, though she does not so say, she thought that the desire to wear good clothes might induce him to work to earn them.

The only thing like unkindness which, according to the proofs, she ever exhibited toward him was in remonstrating with him for his idle, drunken habits, and the proof is that occasionally she did so remonstrate with him, and that he flew in a passion and used loud and harsh language toward her.

But the proof also satisfies me that, in the main, and especially toward the last, they manifested toward each other the ordinary affection of husband and wife, and that she was uniformly kind and attentive to him in all his wants.

He was, for the last two or three years at least, a frequent visitor at the home of his mother and two married sisters, who lived together. The character of his visits there and their extent have, I think, been much exaggerated by them in their evidence.

Mrs. Bauer contends that she habitually gave him money for his expenses of trolley riding, barbers' fees and clothing. I think the amount said to have been given has been exag-

gerated. I have no doubt his sisters did, from time to time, give him money in small sums, and I have as little doubt that he spent the greater portion of it in drinking saloons. Mrs. Bauer claims to have furnished him money to cover the expenses of two summer outings. Against this evidence on his sister's part is convincing evidence that on one of these occasions he received a sufficient contribution in money from the society of Elks, of which he was a member, and on the other he sold an article of jewelry and realized sufficient funds from it.

It appears from the evidence of Mr. Melosh, and also from the evidence of Mr. Weile, president of the Paulus Hook council, that, some two years or more before his death, deceased spoke to each of them separately about changing the name of the beneficiary in his certificate, and was informed by each that it would be necessary, in order to accomplish that result, to produce the original certificate. The reason that he gave Mr. Melosh for the proposed change was that his wife had treated him harshly; and that was the reason for the change that he gave to his sister and Melosh on February 11th and 12th, 1902, as they swear. This ground was unfounded in fact.

It is a part of Mrs. Bauer's case that this change of beneficiary had been in his mind a long time, and that it was not, as alleged by the wife, the result of undue influence exerted by his mother and sisters upon him at a moment when his intellect and will were enfeebled by disease. But we have the remarkable fact clearly established in the case that, in the month of June, or July, 1901, long after the consultations with Mr. Melosh and Mr. Weile just mentioned, he abstracted from his wife's bureau drawer, without her knowledge, the certificate of membership and delivered it to his sisters, Mrs. Brock and Mrs. Bauer, and they had it in their possession for a considerable length of time; that his wife discovered the absence of the document and requested him to return it to her, and that he voluntarily returned it to her a month or two later. Thus it appears that he had ample time and opportunity, several months before he became so entirely besotted, to make the contemplated change, and not only abstained from so doing, but

voluntarily restored the certificate to his wife, and so, as he believed, put it beyond his power to make any change in it.

The truth is that it was not until the very last that he lost all his self-respect. He was fully conscious of his delinquencies and of what he owed to his wife, and in his better moments he fully appreciated it. At other times, when his desire to enjoy himself with companions of the same taste and to play the gentleman around town was strong and his will was weak, he was annoyed by his wife's scolding him for his idleness and drunkenness, and doubtless also for her refusal to furnish him with money to spend to gratify his appetite and to furnish him with the outside clothing of a gentleman, so that he could appear to good advantage on the street.

In the meantime the drink habit increased upon him; he was out almost every night until late—came home generally intoxicated—and in the morning was unable to eat any breakfast, and felt miserable until he had a drink of spirits. Several of the men boarders swore that he would beg them of a morning to go out and bring him in a small quantity of whiskey to steady his nerves.

Finally, in the morning of the first day of February, 1902, he was taken, I am entirely satisfied, with an incipient attack of delirium tremens; he was observed in that condition in his room by one of the boarders. The attention of Miss Wright, the niece, was called to it, and when Mrs. Murphy came in from her morning marketing she gave him her attention, and he begged for spirits. Then, as she swears, for the first time in her life, she sent out and bought a half-pint of spirits, and gave it to him in small doses mixed with milk. The result was that toward night his system had become stimulated and strengthened, so that he was probably as near as ever, during that period, himself. And he then dressed himself and started to go out, as he said, to see the boys and spend the evening. His wife begged of him not to go, but he insisted on going. She at that time was suffering from an attack of gout, and was only able at times to move about at all, and then with difficulty.

. He did not return the next day, which was Sunday, but, as

it afterwards appeared, slept all night in some sort of a saloon, and the next day tried to go to a hospital. That desire to go to a hospital continued for several days, and, I think, showed that he had some good sense left. He found his way to his mother's house on Sunday, the 2d of February, and was immediately put to bed, and, as before remarked, he was continually sustained by stimulants, principally milk punch, from that time until he died.

While at his mother's house he was attended by a Dr. Petrie, who, in addition to the prescription of stimulants, in limited quantities, at stated times, prescribed, as before stated, an opiate, which was also given him.

His wife was confined to the house with rheumatism for three or four days after he left and was ignorant of his whereabouts. As soon as she was able she made a search and found him, and visited him as often as her health and household duties permitted.

On Friday or Saturday, February 7th or 8th, about a week after the deceased came to his mother's house, Mrs. Bauer, with her counsel, Mr. Morten, called upon Mr. John F. Murphy, secretary of the Paulus Hook council, and stated to him that her brother (the deceased) wished to change the beneficiary named in the certificate, and asked him how it could be done. Mr. John F. Murphy said that it would be necessary for them to produce and surrender the original certificate. This, they said, it was impossible for them to do, because it was not in the possession of the deceased; but Mr. John F. Murphy was unable to suggest any mode of avoiding the difficulty. This circumstance is important, because it shows that the existence of the new by-law dispensing, under certain circumstances, with the production of the original certificate was unknown to the secretary of the local council—a man who was undoubtedly the principal executive officer, and, of all others, would be most likely to know and be familiar with all the by-laws of the association. The only way to account for his advice in that behalf, except on the score of his ignorance of the new by-law, was that he knew the circumstances of John J. Murphy and the fact that his wife was paying his monthly dues and assess-

ments and supporting him, and he desired to throw obstacles in the way of any change.

Upon receiving this information from the secretary, Mr. Morten inquired if they could not go to some higher officer for suggestions, and Mr. Murphy referred them to Mr. Carroll, the secretary of the supreme council.

It does not positively appear, except by inference, that they did go to see Mr. Carroll. Be that as it may, Mr. Melosh did learn of the new by-law and did prepare an affidavit, as above set forth. He seems to have acted in the matter in concert with Mr. Morten.

Secretary Murphy, being informed of the illness of the deceased, made a friendly visit to him on Sunday afternoon, February 9th. The sick man made no mention of the certificate of membership, nor any desire to change the beneficiary therein named. This, I think, is also important, and suggests that possibly up to that time the matter had not been mentioned to him by his sister. In the meantime, Secretary Murphy deemed it his duty to inform, and did inform, the wife of what was contemplated by his sister in the way of changing the beneficiary.

I think this information reached the wife on or about the 11th of February. On that day Mr. Melosh prepared the affidavit above set forth, and also a new designation of beneficiary, and intended to make, and thought he had made, an appointment with Mr. John F. Murphy to meet him at the house of the mother in the evening of that day—the 11th—to witness the signature of the deceased, it being conceded that the new designation must be witnessed by the secretary or one of the officers of the local council.

Mr. Melosh went to the mother's house that evening, but Mr. John F. Murphy was prevented from attending. Mr. Melosh took the affidavit of the deceased, as above set forth, and the next day Mrs. Bauer called on the secretary, at his house, to insist upon his coming that afternoon to witness the designation. It so happened that Mrs. John J. Murphy had just called at that house to learn the situation of affairs, and she heard what passed between the secretary and Mrs. Bauer

and the making of the appointment for that afternoon. She did not go to her husband's bedside to interfere with the operations of her sister-in-law, but did consult with her counsel, Mr. Rurode, and in his presence, by telephonic communication with Dr. Petrie, learned that her husband was well enough to be moved.

On the afternoon of the 12th Mr. Melosh and Mr. John F. Murphy, the secretary, met at the house of Mrs. Bauer, and there the new designation was signed and the affidavit and the two papers handed to Mr. Murphy, who, as I have already said, sent it to the supreme council, with the result that they returned the new certificate in the course of three or four days.

On the evening of the 12th the wife visited her husband, intending to have him removed to her house that night; but objection was made by Mrs. Bauer and some sharp words passed, and the husband suggested that she should come in the morning, with a heated carriage and a policeman, and take him home.

There is no doubt that he was perfectly willing to go home with his wife, and he did go home the next morning. He was in the same nervous condition that he had been for many days, and she was obliged to give him, at stated intervals, a stimulant of milk punch, and in that way he was sustained during the day and evening.

In the afternoon Mr. Rurode prepared, on the instruction of the wife and without seeing the husband, the three papers above set forth, and sent his clerk, Mr. Many, a master of this court, to Mrs. Murphy's boarding-house, in York street, and they were there signed and verified by Mr. Murphy.

While Mr. Many was procuring those papers to be signed, Mr. Rurode was holding communication, by telephone, with Mr. John F. Murphy, the secretary, at his place of business in the sugar-house in Jersey City, and urged him to go with him and witness the papers in question.

Mr. Murphy, the secretary, finally, about five o'clock, came to Mr. Rurode's office, and the papers had just been brought in by Mr. Many, signed by the deceased. They were shown

to and looked at by Mr. Murphy, and he was requested by Mr. Rurode to go around to Mrs. Murphy's house and witness the papers, but he declined—declared that he had been censured for what he had already done, or, as he expressed it, "got himself in a hole," and that he would witness no more papers by the deceased unless in the presence and with the consent of the principal men in the local council.

In pursuance of that determination, Secretary Murphy himself prepared a paper, proper to be signed by the deceased, in order to counteract what he had done the night before, and procured Mr. Weile, the president of the local council, and Mr. Holmes, holding some high position therein, both being highly respectable gentlemen, to go with him that evening—February 13th—to the home of the deceased, and they there saw the deceased, in the presence of his wife. The most intelligent and reliable account of the interview is given by Mr. Weile. He was called as the witness of Mrs. Bauer, and swears:

"*Q.* Did you see Mr. John J. Murphy that night?
"*A.* I saw him.
"*Q.* Did you have any conversation with him?
"*A.* I did.
"*Q.* Was Mrs. Murphy present?
"*A.* Mrs. Murphy was in the room.
"*Q.* What was that conversation—I don't mean the second night—I mean the first night?
"*A.* Yes, sir; I asked Mr. Murphy in the first place whether he knew us that were present there, meaning myself, Mr. John F. Murphy, the gentleman who preceded me, and Mr. Holmes; he said he did; I then asked him whether he knew for what purpose we were there and he said he did; he had reconsidered the document that he had executed the day before and wanted to change that.
"*Q.* (By the Court.) Did he say that?
"*A.* He did say it, yes, sir; he says: 'I must have been hypnotized, I must have been crazy, to execute such a document, because I had intended to give all to my wife,' and Mr. Murphy, Mr. Holmes and myself went there for that purpose to witness his signature in case he should execute such a paper, and while we were speaking about it I told Mr. Murphy: 'Anything that you do in this matter must be of your own free acting will,' and he said he knew that; while we were speaking, a lady came in, who I afterward learned was Mrs. Bauer, and Mr. Murphy then said he didn't want to say any more that night; he said: 'Come back to-morrow night and I will do it then;' so we left the house, Mr. Holmes, Mr. Murphy and myself, and came back the next night."

Later on Mr. Weile stated that before Mrs. Bauer came in he had told the deceased that Mr. John F. Murphy had papers ready for him to sign.

The same party visited the house the next night—the 14th—and found there both Mrs. Bauer and her sister, Mrs. Brock, and their brother, Patrick Murphy, surrounding the bed in the room with the deceased, while Mr. Melosh, counsel for Mrs. Bauer, was in the hall.

Mr. Weile's account of the second interview is that not one word was said by him to the deceased or by the deceased to him about the signature to any papers, and the witness judged from the manner of the deceased and the presence of his two sisters and brother, whose incoming had stopped the proceedings of the night before, that deceased would do nothing in the way of signing papers, and he and the party left, and no further attempt was made by any member of the council to procure the signature to any paper by the deceased.

When this evidence was produced the court was not aware that the second set of papers had been signed by the deceased on the afternoon of February 13th, and inquired why the new certificate of membership, which was sent from the supreme council on or after the 13th, had not been delivered to the deceased and his signature of the acceptance procured, the seal of the local council, the signature of the president and local secretary attached thereto, and the court animadverted freely upon what seemed to be a neglect upon the part of the local council to do a plain duty.

The reason given by Mr. Weile was that deceased had declared his desire to leave his first certificate in force, and had refused to sign any more papers, and that they thought it was useless to go to him and complete a new certificate.

It is plain that both Mr. Weile and Mr. Murphy considered that the new certificate was of no value, under the by-laws of the association, until the formalities just mentioned had been complied with.

And looking back and reviewing the evidence, I have no doubt that both persons, and especially Mr. Murphy, the secretary, felt that the original designation of February 12th,

witnessed by him, had been signed by the deceased under such circumstances and influences as rendered its validity questionable, to say the least, and therefore they were unwilling to take the responsibility of giving official approval to the new certificate by setting thereto the seal of the local council and their official signature.

The next day—February 15th—the will was signed, and it is worth while to observe that all the signatures to all of these papers are mere scrawls. The signature to the original certificate, made in 1888, showed that Mr. Murphy was a man who wrote a tolerably good hand, and is in marked contrast with these later signatures; but of all these later signatures, that to the will is decidedly the best, showing the greatest control over his muscles.

The lack of control over his muscles is attributed by Dr. Loomis to the effect of the disease, neuritis.

However, my conclusion of the whole case is that Mr. John F. Murphy was right in saying, as he did, that Mr. John J. Murphy was in such a condition during the period here in question that he would sign any paper for anybody, and I am entirely satisfied that he never would have signed the designation in favor of Mrs. Bauer in the presence of his wife, just as he declined to sign the paper restoring his wife to her full rights in the presence of Mrs. Bauer.

It is argued by counsel that it was generally understood by the parties at and near his bedside on the night of February 14th that he had made up his mind to let the matter stand as it was. Granting that to be so, the question remains, how did he understand the matter to stand? He had, the previous afternoon, signed papers which he may well have supposed, and probably did suppose, restored his wife to her former position. And it is by no means clear that he did not at the moment believe that, as matters then stood, his wife would be entitled to the whole fund. In fact, there is evidence that he said, about that time, that his wife had the original certificate, and for that reason they could not prevent her from getting all the money.

With regard to the condition of his mind, this is to be said:

Catholic Benevolent Legion v. Murphy.

He had been stimulated by alcohol so long and so seriously that, unless that stimulation was continued up to a certain degree, he would fall immediately into delirium, and if he was stimulated so as to pass that point, he would become positively drunk; so that, in order to be at all rational, it was necessary for him to be stimulated with care to a certain degree.

Now, we cannot be sure that he was at any particular time during this period stimulated up to that particular degree which would render him, approximately at least, of sound mind. I say approximately, because I doubt if at any time during this period he was of truly sound mind. He was undoubtedly in a condition which rendered him easily influenced by those around him.

Under these circumstances, I am not satisfied that any of the papers which he executed on that occasion have any validity whatever.

I am entirely satisfied that those he executed on the 13th have quite as much validity as those he executed on the 12th of February. I am entirely satisfied that, so far as he was capable of regretting anything, he regretted his attempt to deprive his wife of the full benefit of the certificate, and that he was, to a degree, conscious of his obligations to her and of her equitable rights.

I have not enlarged upon the falsity of the affidavit of February 11th. Much may be said in favor of the position that the procuration of that affidavit, known, as it must have been, to Mrs. Bauer to be false in some essential respects, was a fraud, practiced not only on the deceased, but upon the complainant society, and, through that society, upon the beneficiary named in the first certificate. It is fairly inferable from the action of Mr. Weile and Mr. John F. Murphy that they were inclined to so treat it.

The rule that the action of the supreme council, either in acceding to the request of the member to issue a new certificate, or refusing so to do, is final and conclusive on the rights of the parties, as apparently held by Vice-Chancellor Grey, in *Grand Lodge* v. *Gandy, supra,* is founded on the idea that such action is based on an affidavit stating the truth made intelligently and

freely by a sane man, who fully appreciated the act and was not subjected to undue influence, and does not sanctify a certificate issued under the circumstances here present, and cannot give the new beneficiary any right of action against the association, or affect the rights of the beneficiary named in the old certificate.

It is said that the deceased declared to his sister and Mr. Mclosh that he had not lived at home in three years, and that his wife had thrown him out of doors. There is no foundation whatever in fact for the last assertion as to his being thrown out doors, and the assertion that he had not lived with his wife for three or four years has just this much, and no more, of truth in it: He had, for about three years, ceased to sleep in the same bed with his wife, and had been furnished with a comfortable bed in an adjoining room, all at his own request, because he was conscious of the truth, viz., that he was an unfit bedfellow for any person, man or woman.

It was further urged that the moneys paid by Mrs. Murphy for dues and assessments on the certificate should be treated as mere loans, and she should be allowed a lien upon the fund for that much advanced.

The complete answer to that is that the money was not paid as a loan, but paid by her as beneficiary, in order to keep the policy alive, and with the understanding that she was to have the final benefit. Moreover, I think the circumstances, taken altogether, justify the conclusion that the support which she furnished her husband during the five or six years that she did support him should also be considered as so furnished on the strength of the policy. She was under no obligation to support him, and would have been justified, in morals and law, in casting him off and refusing him a home.

Then again, it is said that the moneys which his sister furnished him from time to time also creates an equity in her favor. I am unable to adopt that view. The contributions were made voluntarily by the sister as gratuity to her brother, without any reliance upon receiving anything from the benefit certificate.

My conclusion then is, first, that the wife's equity is so strong

that it could not be overcome even though the new designation was made by her husband deliberately, when in the full control of his faculties and uninfluenced by his sister, and even though it had been carried out with all the technicality necessary to make the new certificate effective.

And in the second place, I am of opinion that the affidavit and new designation upon which the sister relies were, under the circumstances, insufficient to support the new certificate even if that had been fully and completely issued by the supreme council.

But I am also of the opinion that, under the circumstances, the supreme council did not intend to make a complete execution and delivery of such new certificate until it had been passed upon by the local council, and that the local council deliberately abstained from giving full effect to that new certificate for the reason that they were not satisfied that it was based upon the deliberate action of a sane man.

Referring again to the case of *Grand Lodge* v. *Gandy,* decided by Vice-Chancellor Grey, relied upon by counsel for Mrs. Bauer, I find that the learned vice-chancellor was there dealing with a case in which there was a complete absence of any equity based on pecuniary consideration on the part of either claimant.

The children to whom he awarded the money were the natural objects of his bounty and of his duty, while the claim of Miss Gandy was without the least fact to sustain it in a court of equity. She was a mere employe for a wage in his service, so that the decision is strictly in accord with what may be termed the natural equity of the case. The learned vice-chancellor put his decision on two grounds—*first,* the fact that the designation in favor of Miss Gandy was not completed in technical accord with the rules of the association, and *second,* that Miss Gandy was not one of the persons who, according to the constitution of the society, was capable of taking a benefit. This last reason was ample in itself, without relying on the first reason, which, although not in accord with the great weight of authority, as I find it upon the examination of a large number of cases where the money has been paid into court, yet would bind me if it were precisely in point.

The conclusion at which I have arrived is sustained by what I think is sound reason as well as authority.

The case of *Pennsylvania Railroad Co.* v. *Wolf,* above cited, reported in *52 Atl. Rep. 247,* was, as here, a case of interpleader. The decedent was possessed of a benefit certificate in which his sister was named as beneficiary. Afterward he married and agreed with his wife, before marriage, that he would make her the beneficiary in place of his sister. This he never did, and died leaving his sister named as the beneficiary. Claims being made by both the widow and the sister, the custodian of the fund paid the money into court, and it was there adjudged to the widow.

The language of the learned judge (on *p. 248*) is significant:

"Nominally, at the husband's death, Alice R. Young was entitled to the fund. In this view of the facts, what effect has the antenuptial contract, or what effect ought it to have, in equity, upon a disposition of the fund? Concede, as argued by appellant's counsel, that a member of the association has only the power of appointment of a beneficiary, subject to the approval of the relief association, still, as between him and his appointee, equity will take cognizance of facts entering into the transaction, so that, as between them, flagrant wrong shall not be done. We say as between the member and his appointee, for the law is settled that, if the association insists on its legal rights under its rules, equity will not interfere between it and its members. But the relief association wholly withdraws from this contest. It pays the money into court, and, in effect, says: 'Wage your war between yourselves. I will have nothing to do with it.' So that all the authorities cited on either side as to the rights of the complainant against the association are wholly outside this case. We then have the sister nominally the payee in the certificate. The member, under the rules, had the right, at any time, to name another in her stead. She was a mere volunteer, having given no consideration, and, it must be presumed, had full knowledge that her brother could, at any time, strike out her name and substitute that of another, as he did when he struck out his first wife's name and substituted hers. He promised to substitute that of the second wife when she married

him.   She did marry him.   He did not substitute, formally,
her name.   We have no reason to doubt this omission was from
neglect, not because of willful wrong.   But the moment the
marriage contract was complete, the wife had an equitable claim
to the certificate, or to the benefit it represented.   It was not
that sort of a mutual contract which could be very conveniently
performed by each party at the same time.   Marriage, the con-
dition, must almost necessarily follow after the promise, and
she had no right to substitution until after marriage.   But
when she married him, she had a vested right in the benefit—
a right not dependent on his will or whim, but one no longer
in his power, as between him and her, to confer or withhold.
She could not take back the consideration she gave.   He could
not give it back to her.   He could only formally transfer to
her that which, by the consummation of the contract, was hers.
He ought, in form, the day of the marriage, or immediately
after, to have done that.   Equity will now treat that as done
which ought to have been done.   To illustrate the application
of the principle, suppose the intended wife had made the prom-
ise, and the intended husband then had, regularly, under the
rules of the association, appointed her the beneficiary, and then
she had refused to marry him, and before he had time to create
a new appointee he died; would equity, assuming the associa-
tion did not interfere, have permitted her to receive the fruits
of her fraud?   There is no more reason why she should suffer
the penalty of his neglect."

In *Leaf* v. *Leaf, 92 Ky. 166; 17 S. W. Rep. 354, 854* (twice
argued), the beneficiary named in the certificate issued to the
husband was his then present wife.   Later the husband and wife
were separated by an absolute divorce, and the certificate was
given by the husband to the wife as her property, and she paid
the assessments thereon for two years or more after the divorce.
By making an affidavit that the certificate was not in his pos-
session the member changed the designation and obtained a
new certificate payable to his sons by a former marriage.   The
money being paid into court, it was held that the first bene-
ficiary, the divorced wife, should take the fund, although, if

Catholic Benevolent Legion *v.* Murphy.

the society had paid the money to the second beneficiary, such payment would have been upheld. The court said:

"The wife has intercepted the fund before it reaches the children who are named as the beneficiaries, and her equity is so great that no chancellor should withhold a judgment in her favor."

I think that the wife in the present case comes within the principle upon which the courts acted in those cases, although they are, in some respects, stronger cases.

Another case much in point is *Swift* v. *Railways Conductors' Association, 96 Ill. 309.* In that case the rules of the association directed that the money to arise from the insurance might be disposed of by will, and if not so disposed of, should belong to, and be paid to, the widow, or, in case the insured had no widow, then to his legal heirs and representatives. In 1875 he made a will and therein bequeathed to his two daughters the proceeds of the insurance and appointed a man named White as executor, and afterwards delivered to White the will and the certificate of membership in the association. In 1877, being in California, he signed an informal paper stating that the certificate should be for the benefit of his wife. This paper was enclosed in a letter to his wife, wherein he asked her to pay the assessments, saying he would refund them to her, and also saying that the certificate was hers if she wished to keep it paid up. Thereafter she paid the assessments (only $38) and kept the policy alive. The wife was held entitled to the proceeds of the policy under the doctrine of equitable assignment for a valuable consideration.

*Grand Lodge* v. *Child, 70 Mich. 163.* One Child, living in Michigan and having a wife and son living in England, instituted proceedings for divorce from his wife, and at the same time entered into an agreement of marriage with Miss Drury. Pending the engagement he took out a benefit certificate in her favor for $2,000. She saw and knew of the certificate, but did not have it in her possession. Upon learning that Child had a wife living, she broke the engagement with him, and afterwards married O'Connor. Subsequently Child lost his certificate, and attempted to procure another in favor of his child, but the

association refused to issue a new certificate because he did not procure the first one.    Mrs. O'Connor, formerly Miss Drury, and the son of the deceased each claimed the money.    The court, in awarding the money to the son, used the following language:

"We do not deem it our duty, upon this record, to consider the liability of the complainant upon the certificate.    Both defendants claim it, and the complainant concedes and offers the money to the person entitled; and, thus admitting the right of one defendant or the other to the money, we are asked, in equity and good conscience, to determine which one of the two is entitled to the fund.

\*      \*      \*      \*      \*      \*      \*      \*      \*

"Equity will consider that done which ought to have been done.    For the purpose of determining the rights between these defendants the proceeding is governed by equitable principles. The fund is held in trust by the order for the person to whom it belongs; and it is true in this, as in every other case, equity follows the law, so far as the law goes in securing the rights of the parties, and no further; and, when the law stops short of securing this object, equity continues the remedy until complete justice is done.    In other words, equity is the perfection of the law, and is always open to those who have just rights to enforce where the law is inadequate.    Any other conclusion would show our system of jurisprudence, not only a failure, but a delusion and a snare.    Justice alone can be considered in a court of chancery, and technicalities can never be tolerated, except to obtain and not to destroy it, and the greater equity should always be allowed to prevail.    There can be, it seems to me, no doubt in this case where it lies."

*Splawn* v. *Chew, 60 Tex. 532 (1883).*    The third headnote is as follows:

"Where a section in the by-laws of such association reads: 'Applicants shall enter upon their application the name or names of the members of their family dependent upon them, to whom they desire their benefit paid, and the same shall be entered in the benefit certificate (issued instead of a policy) by the supreme secretary, subject to such future disposition among their dependents as they themselves direct,' such section vests the control of the certificate, so far as the selection of its beneficiaries is

concerned, in the member insured. A clause or by-law of an insurance or other corporation, pointing out a way in which the right to dispose of the insurance money may be exercised, or relating to some other rights, merely directory in its character, and whose object is to protect the corporation, cannot be taken advantage of by outside parties claiming the insurance or other right under the charter of such corporation. Such provisions are for the protection of the company alone and can only be used by it."

This was a contest between the father and mother, who were named as beneficiaries in a certificate of deceased member of the American Legion of Honor, on the one part, and his executors, in behalf of his widow and two children, on the other part.

The beneficiaries named in the original certificate were the father and the mother. Subsequently the member married and had two children, and a short time before his death made a will bequeathing the proceeds of the certificate to his two infant children, the interest on it for the support of his wife during her widowhood. The money was paid into court by the association, so that the affair assumed the position of an interpleader.

The by-law with regard to a change of beneficiary was in these words:

"Members may at any time, when in good standing, surrender their certificate, and have a new one issued, payable to such beneficiary or beneficiaries dependent upon them as they may direct, upon payment of a certificate fee of fifty cents."

That was the only provision for a change of beneficiary, and it was contended that the disposition by will did not meet that requisition, and hence the money was still due to the father and mother. The court (on *p. 536*) inquired thus:

"But is this the only way in which such change can be effected? The right to make the change is given by a different section of the by-laws, and exists in the insured as long as he remains a member of the order. A method by which he may accomplish it to the satisfaction of the order is pointed out in the section last recited, but we do not consider this as exclusive of all other ways of effecting the same object. *The design of*

*this section is to protect the interests of the corporation. The company are entitled to know who are the parties entitled to the benefit-money, and this is an effectual and certain means of giving that information. But, like all such provisions in the by-laws of private corporations, it may be waived at the option of the corporation, being for its benefit alone.* This has been held with reference to such provisions when prescribed in mandatory terms. If they can be waived in such cases, much stronger would seem to be the reason why this can be done when the course to be pursued is directed, as in this instance, in permissive language alone."

Near the bottom of *p. 537* the court says:

"This suit is not between the claimant of this money and the corporation by whom it is to be paid, and the latter does not object to the manner in which the change of beneficiaries was made. * * * Upon principle, however, and the rules which govern in the analogous cases to which we have alluded, we think, as between the parties to this suit, the change of beneficiaries was fully effected by the will of E. J. Chew, and the right to the insurance money was vested in the parties named therein, the children of the deceased, and the judgment of the court below should have been in favor of the appellants."

*Titsworth* v. *Titsworth, 20 Pac. Rep. 214 (Supreme Court, Kansas, 1889).* This, again, was, in effect, a suit of interpleader. The money was paid into court by the association, the A. O. U. W. The constitution of that association provides as follows:

"Any member holding a beneficial certificate, desiring at any time to make a new direction as to its payment, may do so by authorizing such change in writing on the back of his certificate in the form prescribed, attested by the recorder, with the seal of the lodge attached; and by the payment to the grand lodge of the sum of fifty cents; but no change of direction shall be followed or have any binding force or effect until said change shall have been reported to the grand recorder, the old certificate, if practicable, filed with him, and a new beneficiary certificate issued thereon, and said new certificate shall be numbered the same as the old certificate; provided, however, should it be impracticable for the recorder to witness the change desired by the brother, attestation may be made by a notary public or an officer of a court of record, seal to be attached in attest."

The change was attempted to be made in this case by a letter written and signed by the member on a sick bed, changing the beneficiary from his divorced wife to his mother and brother, and the same amanuensis made the proper changes on the back of the certificate and sent them to the lodge, who issued a new certificate. The contention was that that change was ineffectual, but the court (on *p. 214*) says:

"In the determination of the question arising in this case it must be borne in mind that the A. O. U. W. association is no longer a party and is not taking any part in the litigation. It has paid the money into court and has been released from all obligation respecting it. This payment, however, is an admission on its part that the benefit certificate was actually issued, and hence all contention as to whether its rules and regulations respecting these matters had been complied with is out of the case and is entirely disposed of."

*Manning* v. *A. O. U. W., 5 S. W. Rep. 385 (Court of Appeals, Kentucky, 1887)*, is substantially to the same effect as *Titsworth* v. *Titsworth.*

*Martin* v. *Stubbings, 126 Ill. 387; 18 N. E. Rep. 657,* is an instructive case upon the question of the right of a member of a beneficiary association to defeat the right of the beneficiary named therein by pledging the certificate as security for a debt. Such right was upheld in that case.

The foregoing are a few of the cases cited by Mr. Bacon in support of the text as found in the second edition of his treatise on Benefit Societies, &c., volume 1, sections 305 to 311, inclusive. They sustain the principle asserted by him that when a society pays the money into court it thereby waives all mere technical defences which it might set up against either claimant, and leaves the court free to award the fund upon equitable principles. For this position we have some support, at least, in the decision of our own court of appeals in the case of *Meyer* v. *Schuman, 9 Dick. Ch. Rep. 414.*

Further, the authorities above cited show that the mode provided for making a change of beneficiaries is not in all cases exclusive of other modes, except in a suit against the society, so that where the society pays the money into court it leaves

the court at liberty to determine the destiny of the fund according to the real wishes of the decedent. The application of these principles gives the fund to the wife.

In coming to this conclusion I have not had occasion to consider another point made by the wife, viz., that, according to the original certificate of incorporation, Mrs. Bauer is not competent to take. The language of that constitution is that the benefit fund shall be paid to the family or dependents of the member, as he shall have directed. It is argued that Mrs. Bauer was not a member either of his family or dependent upon him.

I will advise a decree that the fund be paid to Mrs. Murphy, and that she recover against Mrs. Bauer her costs of this suit, including, of course, the costs and counsel fee, if any, paid out of the fund to the complainant.

The complainant is undoubtedly entitled to costs and counsel fee, if he has not already received them.