ESTHER FENDLER, Appellant, v. JOSEPHINE ROY.—58 S. W. (2d) 459.

Division One, December 31, 1932.

*Wurdeman, Stevens & Hoester* for appellant.

*Jones, Hocker, Sullivan & Gladney* and *James C. Jones, Jr.,* for respondent.

FERGUSON, C.—Upon his application, two life insurance policies, each for $5000, were issued by the Metropolitan Life Insurance Company, on April 3, 1925, to Michael Fendler, in which his wife, Esther Fendler, was named as beneficiary. By the terms of the policies the right was reserved to the insured, Michael Fendler, to change the beneficiary. On September 1, 1927, the insured changed the beneficiary naming his sister Josephine Roy as beneficiary. Fendler died February 26, 1929. Shortly after the death of her husband the widow, Esther Fendler, the original beneficiary named in the two policies, brought this suit in the Circuit Court of St. Louis County against the Metropolitan Life Insurance Company and Josephine F. Roy. The petition alleges the issuance of the policies, the change of beneficiary therein from plaintiff to Josephine Roy and that at the time such change in beneficiary was made by the insured he was of unsound mind. Plaintiff asks judgment against the Insurance Company for the amount of the policies with interest thereon, that Josephine Roy be required "to surrender up and deliver" the policies to plaintiff and be "permanently enjoined and restrained from collecting or attempting to collect any funds due under" the policies.

The Insurance Company filed an answer in the nature of a bill of interpleader alleging the conflicting claims of plaintiff and defendant Josephine Roy to the proceeds of the policies. By stipulation the parties agreed that the answer of the Insurance Company was a proper bill of interpleader and accordingly the proceeds of the policies were paid into court and the plaintiff and Josephine Roy were ordered to interplead for the fund. Plaintiff's petition was considered as her interplea. The answer of Josephine Roy asserted that as the beneficiary named therein she was entitled to receive the proceeds of the policies. The sole question to which the evidence was directed was, whether the insured was sane or insane at the time he made the change of beneficiary. The chancellor's decree and judgment was for defendant, Josephine Roy, and that she was entitled "to the proceeds of the insurance policies." From that judgment plaintiff appealed.

Appellant contends that the finding and decree of the chancellor is against the weight of the evidence; that the evidence does not warrant and sustain the decree and that under the evidence and the law applicable thereto the decree should be for plaintiff. The record is lengthy, composed, as it is, of the testimony of the numerous witnesses together with hospital records and certain court proceedings, records and files but we shall undertake to fairly summarize the evidence.

The plaintiff was married to Michael Fendler on December 8, 1920. At the time he was engaged in the garage and automobile sales business with his father but about a year after the marriage Michael Fendler withdrew from the partnership with his father. A suitable building was purchased on Lemay Ferry Road in St. Louis County, title thereto being vested in the husband and wife jointly and a garage and automobile sales agency was established. The business seems to have been conducted by the husband and wife jointly. She did the office work, kept the books and accounts, sold accessories and merchandise and occasionally sold automobiles. The family resided in a living apartment which was a part of and at the rear of the same premises. Two children were born of the marriage, a boy born November 29, 1921, and a girl born June 16, 1924. The garage and sales business was prosperous and lucrative. Michael Fendler was a capable, energetic and successful business man of temperate habits, devoted to the welfare of his wife and children. In April 1925, he made application to the Metropolitan Life Insurance Company for life insurance and the two policies in controversy, aggregating $10,000, were issued. Sometime in 1925 he began to drink intoxicating liquor, mostly of the variety known as moonshine whiskey, to excess and was frequently intoxicated. During 1926 the periods of intoxication became more and more frequent and in

1927 he had become so addicted to the excessive use of intoxicating liquor that according to the testimony of plaintiff's witnesses he was drunk a greater part of the time. One result of his repeated and prolonged drunkenness during 1926 and 1927 was neglect of his garage and sales business which slumped until it was apparently no longer profitable and the automobile sales agency contract was cancelled. When intoxicated he was often violent, boisterous, reckless and abusive. Fendler's conduct at such times is depicted by the plaintiff and neighbors, friends and employees testifying as witnesses for plaintiff. He would curse his wife and children, speak to them and refer to them in the vilest of language and epithets, strike and assault his wife, drive her and the children from the home at late hours of night and on one occasion followed her as she fled, late at night, from his drunken fury and threats and knocked her down upon the sidewalk whereupon a neighbor interposed and compelled him to desist, for that time, from the assault. Numerous times he broke the furniture in the home, smashed the windows in drunken glee or anger, as may have been his mood of the moment, and overturned the dining table when same was prepared for the family meal. On several separate occasions he became violently enraged and broke the windows of the garage, smashed the glass in the doors, windows and windshields of both new and used automobiles in the sales room of the garage and with a heavy hammer dented and damaged new automobiles which were exhibited for sale in the sales room. He would drive an automobile from the garage, abandon it some distance away, either walk back or return by taxicab and drive another automobile from the garage and abandon it in the same manner, and repeat this performance until he would have several automobiles abandoned at distant places which his employees would seek out and retrieve. One night, at about one o'clock, he took "ten or fifteen" automobiles from the sales room, drove them some distance away, formed them in line along the road and left them to be sought, recovered and returned by his employees on the following day. It was related that on some two or three occasions, in the winter time, he removed his outer garments and ran, shouting, along the street clothed only in undergarments. He frequently threatened violence to his wife and others and made threats to kill himself and on at least two occasions attempted suicide. A deputy constable of Carondelet Township testified that in 1926 and 1927 he arrested Fendler so many times, for drunkenness, that he could not estimate the number of times; that at such times he was violent; that he saw Fendler intoxicated often when he did not arrest him and that sometimes he had seen Fendler intoxicated "three or four times" within a week. In the latter part of 1926 and in 1927, Fendler suffered several attacks, some described as "fits," others as "delirium tremens" and "alcoholic delirium." On the occasion

of such attacks in September and November, 1926, the plaintiff upon recommendation and with the aid of a physician, called to attend Fendler, arranged for his admission to the Alexian Brothers Hospital and Sanitarium for treatment. He was first admitted there September 7th and released the next day September 8, 1926, the hospital records showing "acute alcoholism." The second admission to that hospital was November 27, 1926. At that time he remained at the hospital seven days. The admission diagnosis, as shown by the hospital records, was "chronic alcoholism." On January 7, 1927, he was placed in St. Vincent's Sanitarium and remained there ten days. The diagnosis, as appears by the hospital records, was "delirium tremens." In May, 1927, the plaintiff filed information in the Probate Court of St. Louis County alleging her husband was of unsound mind and upon a hearing in the Probate Court on May 20, 1927, found and adjudged: "Michael Fendler . . . to be a person of unsound mind" and "so far disordered in his mind as to endanger his own person and the person and property of others." It was further ordered and decreed that he "be confined in State Hospital No. 4 at Farmington, Missouri." Pursuant to this commitment Fendler was taken to State Hospital No. 4 where he was confined until June 24, 1927, on which date pursuant to a judgment of restoration entered by the Probate Court of St. Louis County he was discharged. A petition for restoration alleging that Fendler was of sound mind was heard in the probate court on that day and the court found and adjudged him to be of sound mind. The records of the Hospital No. 4, offered in evidence by defendant, show diagnosis, "alcoholism without psychosis." Returning to his home Fendler according to the testimony of plaintiff's witnesses, resumed and continued the excessive use of intoxicating liquor so that he was frequently intoxicated at which times he was often violent and abusive. On August 5, 1927, his wife, the plaintiff herein, left the home and went with her children to the home of her mother to reside and thereafter refused to see Fendler or talk with him when he came to his mother-in-law's home. On August 13, 1927, the wife filed suit for divorce and on August 25, 1927, filed a suit for damages against her husband's parents charging alienation of his affection. When his wife and children left home Fendler went to reside with his parents at their home in St. Louis County. During the time Fendler was at the State Hospital the insurance policies in controversy lapsed. Later plaintiff turned the two policies of insurance over to the agent who had sold the policies to Fendler, for reinstatement and made a payment for that purpose but it is not clear just when this occurred. The policies were reinstated but not returned to Mrs. Fendler as Fendler called for the policies at the office of the insurance agent and they were turned over to him. Afterwards it seems Fendler executed a loan agreement on the policies to pay

premiums which matter was handled by this agent. At that time and in that connection the agent sent the policies to the home office of the Insurance Company for endorsement. Before the policies were returned Fendler called the agent and asked him to come to his parent's home where he was at the time residing. This was the latter part of August, 1927, and on the night of September 1, 1927, and early in the evening, the agent in response to such request called on Fendler at his father's garage and place of business. Fendler told the agent that he wanted to change the beneficiary. They went upstairs into the family living apartments, above the garage, the agent filled out the proper forms and Fendler executed the forms designating his sister as beneficiary. The agent testified that at the time these transactions were had Fendler was "sober," appeared normal and "there was nothing unusual in his conduct." Thereafter, the date is not stated, the divorce suit was tried, submitted and taken under advisement by the court. While the cause was under advisement the judge before whom it was tried died. The divorce suit was not again tried and a reconciliation having been effected between the wife and husband, both the divorce suit and the alienation suit were dismissed on April 21, 1928. The marital relation was resumed and for a short time Fendler abstained from the use of intoxicants but plaintiff and others testify that shortly after the reconciliation he began to again drink to excess. Fendler was drunk on Saturday, February 20, 1929, was away from home all that night and did not return to his home until the following afternoon, Sunday, February 21, 1929. At home he continued drinking and sometime during that afternoon committed suicide. The testimony of the witnesses for plaintiff related for the most part to incidents, which occurred, and their observation of Fendler's conduct during 1926 and 1927 at times when he was intoxicated. Most of these witnesses qualified their testimony, on cross-examination, by statements such as: "He was a nice fellow when he was sober; able to handle business alright;" "he was capable of transacting business when sober;" "he was a nice chap when sober . . . was a capable fellow when sober . . . was a good business man when he was sober;" "Mike was a good salesman when he was sober" . . . and made some good deals in 1926 and 1927;" and "he was alright when he was sober." As the writer recalls the testimony plaintiff's witnesses, with the exception of plaintiff herself, did not state either specifically or approximately that they had observed Fendler to be intoxicated or that any of the incidents related occurred in that period from August 5, 1927, to April 21, 1928, during which the wife and husband were living apart. Some of the witnesses did say that they had frequently observed him in an intoxicated condition at various times throughout the years 1926, 1927 and in 1928. The change of bene-

ficiary was made early in the evening, which is the only approximation as to the time thereof the writer can find in the record, of the night of September 1, 1927. The plaintiff testifies, that after she left her husband and with her children took up her residence at her mother's home Fendler frequently came there in an intoxicated condition and demanded admission which was refused and that he would curse and utter vile epithets and threats; that on August 31, 1927, he came to her mother's home "in the evening," that he was intoxicated, came "up on the porch and knocked and cursed something awful" and demanded admittance to the house which was refused whereupon he seized a glass fruit jar and hurled it through a window and demolished part of the porch banister; that during the evening of the following day, September 1, "he came up again and wanted to come in and we said he couldn't come in. He was so intoxicated he could hardly walk . . . he cursed and moaned something awful for awhile" then left but "came back again about eleven-thirty," was still intoxicated and "cursed and carried on and said he was going to wreck the place." The testimony of the witnesses for the defendant is quite to the contrary. The defendant, Josephine Roy, resided temporarily at the home of her parents, where her brother Michael also resided during the time of the separation from his wife, during the months of July, August and September, 1927. She testified that she saw Michael Fendler almost daily from the first part of August, 1927, until April 1, 1928; that he was not using intoxicants during that period so far as she was able to detect; that a few days before he made the change in beneficiary designating her as beneficiary in the policies he told her of his intention to do so "because you are my favorite sister;" that she was at home the night of September 1st, when the insurance agent called and Michael executed the forms and that Michael was not away from home that evening or night and was "absolutely sober." Joseph A. Roy, husband of Josephine Roy, testified, that he came to the home of his wife's parents about six o'clock of the evening of September 1, 1927, and he was with Michael that evening and that night and talked with him and Michael was "perfectly sober;" that Michael "had not been drinking for a week or so before" and did not drink any "for some weeks after" that date; that he knew Michael was home that night the entire time until witness retired which was between ten and eleven o'clock. The testimony of the insurance agent is referred to above. Catherine Fendler, another sister of Michael, stated that he was not drinking "the latter part of August" and in September, 1927; Arthur Fendler, brother of Michael, who conducted a garage and automobile sales agency, testified that Michael worked for him as a salesman "periodically after he came back from Farmington;" that Michael was "not drinking" during the latter part of August, 1927, and that during the remainder of that year

he did not know of Michael using intoxicants until around Christmas; that Michael was at his "place" during the afternoon of September 1, 1927, was sober and at that time they planned a hunting trip for Saturday, Sunday and Monday (Labor Day) September 3, 4, and 5, and that accompanied by the witness' wife and three weeks old baby they drove to the home of relatives in the country and spent the three days hunting as planned and that Michael was not drinking during any of that time. Arthur Fendler's wife related the incident of the hunting trip and stated that from August 28 to September 5, 1927, Michael "ate dinner at our house practically every day for a week" and that he was sober at all such times. Arthur Fendler testified to nine sales of automobiles, by the agency which he conducted, made and completed by Michael, as salesman, on the following dates, August 12, 23, 25, September 10, 22; December 28, 1927; January 31, February 15, and March 6, 1928. Harry C. Donnegan testified, that he was acquainted with Michael Fendler from 1912 until his death; that in August, 1927, he leased a building in St. Louis County from Michael's father and opened an agency and sales rooms therein for the sale of Star Automobiles and accessories; that Michael was around this place "the last of August and the first days of September," 1927, when the witness was there "practically every day getting the place in readiness;" that he (Donnegan) had a contract with the St. Louis Spring Company "that did not run out until January," 1928, and "had to stay there that long;" that, he "placed Mike in charge of" this sales agency which he established; Mike went to work for him September 13, 1927; the agency was opened for business on the following day, September 14; that, "Mike had complete charge of the place" and "stayed in my employ until May 12, 1928, when I closed out the business;" that, "Mike sold automobiles, parts and tires, took in the money and put it in the bank and when bills were to be paid Mike wrote a check against my account and paid them. . . . I was down there every day, I would go there in the morning before I would go to the office and would be back there in the evening;" that while in operation the agency sold ninety-six automobiles and there were "two salesmen besides Mike." The witness said he never saw or knew of Fendler being drunk during this entire period. In answer to the question, "along the last days of August and the first days of September," 1927, "do you know whether Mike was drinking or was he sober," the witness said: "he may have had a drink but he wasn't drunk because that is about the time I hired him to work for me. If he hadn't been sober I wouldn't have hired him because I had $10,000 worth of automobiles on the floor and more coming in all the time." Several other witnesses testified on the part of defendant to business transactions with Michael Fendler at various times during the latter part of 1927, in 1928 and January,

1929, and that at such times he was sober and appeared normal. Dr. Arthur Deppe, qualifying as an expert and specialist in nervous and mental diseases, testified on behalf of plaintiff. In response to a hypothetical question assuming as true and enumerating the matters and incidents as developed by the testimony of plaintiff's witnesses as to Fendler's history, family life, conduct, and excessive and continued use of alcoholic liquors, the witness stated that in his opinion Fendler "was not of sound mind on or about September 1, 1927." Two expert witnesses, qualifying as specialists in mental and nervous diseases, testified on the part of the defendant, Dr. Tate of the staff of State Hospital No. 4 at Farmington and Dr. Francis M. Barnes. Dr. Tate stated that when Michael Fendler came to the State Hospital and when he was discharged from that institution about a month later, he made an examination, "along with other staff members," of the patient and "my examination, diagnosis and history is reduced to writing." This record was received in evidence. Dr. Tate further testified: "When he first came he was rather nervous; that was due to alcoholism. I never considered him insane. His condition improved rapidly. I considered him normal when he left. A long and continued use of alcohol will bring about an alcoholic psychosis which means permanent mental derangement. We diagnosed his condition as alcoholism without psychosis. Our opinion was, upon entering the institution his condition was due to a toxic condition. In my opinion the brain functions were not permanently impaired in any way and I considered him normal when he was discharged." The hospital records and diagnosis shows: "mental status normal;" "seems to be in normal condition mentally;" "healthy in appearance;" "heart and lungs normal;" and "patellar and pupillary reflexes normal." In response to a hypothetical question embracing defendant's summary of the evidence with especial reference to business transactions by Fendler immediately before, about the time of and immediately after the change in beneficiary was made and the circumstances surrounding that act as related by witnesses on the part of defendant, Dr. Barnes stated that in his opinion Fendler "was sane on the night of September 1, 1927." It seems that plaintiff did not learn that the beneficiary in the policies in controversy had been changed until after her husband's death. She collected the proceeds of other insurance policies, in which she was named as beneficiary, in the amount of $5750.

The policies reserved the right to the insured to change the beneficiary. "Where there is no provision in the policy that the insured may change his beneficiary, the rule is 'that the issue of the policy confers immediately a vested right upon, and raises an irrevocable trust in favor of, the party named as beneficiary, a right which

no act of the insured can impair without the beneficiary's consent.' [Blum v. N. Y. Ins. Co., 197 Mo. 513, 523; Bank v. Hume, 128 U. S. 195, 206; Cornell v. Insurance Co., 179 Mo. App. 420, 429.] However, if the right to change the beneficiary is reserved in the policy, the insured may make the change without the consent of the beneficiary. [Robinson v. Ins. Co., 168 Mo. App. 259; 25 Cyc. 892; Cornell v. Ins. Co., supra.]" [Missouri State Life Ins. Co. v. California State Bank, 202 Mo. App. 347, 216 S. W. 785.] "Where the policy reserves to insured the right to change the beneficiary, a change of beneficiary may be made at his instance, without the knowledge or consent of the original beneficiary, or notice to him, unless insured has divested himself of the right, as by assigning all his rights under the policy, agreeing to keep the policy in force for the beneficiary or making a completed gift of the policy to the beneficiary by delivery to him." [37 C. J. p. 583. Robinson v. New York Life Ins. Co., 168 Mo. App. 259, 153 S. W. 534; Clarkston v. Metropolitan Life Ins. Co., 190 Mo. App. 624, 176 S. W. 437; Metropolitan Life Ins. Co. v. Fidelity Nat. Bank, etc. Co., 206 Mo. App. 676, 229 S. W. 399; Missouri State Life Ins. Co. v. California State Bank, supra; Reid v. Durboraw, 272 Fed. 99; Masonic Benevolent Assn. v. Bunch, 109 Mo. 560, 19 S. W. 25.] ■ While the plaintiff as the designated beneficiary in the policies in controversy did not have a vested interest therein or property right to the proceeds thereof and could not by vested right have stayed the substitution by the insured of another as beneficiary she did however have such an interest as entitled her, upon discovery after her husband's death of the change of beneficiary, to question the mental capacity of the insured at the time such change was made or attempted. If at the time he executed the change of beneficiary Fendler was insane, and legally incapacitated to contract, a valid change of beneficiary was not effected and the only valid contract ever existing between him and the insurance company was that by which the insurer agreed to pay the amount of the policies to plaintiff upon Fendler's death and upon his death she could attack the attempted change or modification of the contract by showing there had been no valid change for want of mental capacity. [7 Cooley's Briefs on Insurance (2 Ed.) p. 6467; Grand Lodge A. O. U. W. v. McGrath, 133 Mich. 627, 95 N. W. 739; Goyt v. The National Council K. & L., 178 Ill. App. 377; Grand Lodge A. O. U. W. v. Frank, 133 Mich. 232, 94 N. W. 731; Cason v. Owens, 100 Ga. 142, 28 S. E. 75: Supreme Council Catholic Benev. Legion v. Murphy, 65 N. J. Eq. 60, 55 Atl. 497; Ownby v. Supreme Lodge K. of H., 101 Tenn. 16, 46 S. W. 758; Sovereign Camp W. O. W. v. Broadwell, 114 Mo. App. 471, 89 S. W. 891; McMurtray v. McMurtray, 67 Okla. 50, 168 Pac. 422; Turner v. Turner (Texas), 195 S. W. 326.] "If, however, the attempted change is invalid and in-

effective for any reason, the rights of the original beneficiary are not affected, and the original designation remains in force.'' [7 Cooley's Briefs on Insurance (2 Ed.) p. 6471.]

The plaintiff claims and seeks to enforce rights as beneficiary alleging that at the time he attempted to change the beneficiary Fendler was of unsound mind and for that reason the change of beneficiary executed by him, and endorsed upon the policies, is wholly ineffective and the original designation of plaintiff as beneficiary remains in force. The burden of proof rested on plaintiff to establish the allegation that her husband was at such time of unsound mind and lacking in mental capacity to make a valid change of beneficiary. Sanity and competency like honesty and fair dealing is supported by a legal presumption and one alleging insanity and incompetency must sustain the burden.

'' 'Unsoundness of mind' has been judicially declared to be synonymous with 'insanity.' It exists where there is an essential privation of the reasoning faculties, or where a person is incapable of understanding and acting with discretion in the ordinary affairs of life.'' [32 C. J. 621.] The testimony of the specialists in mental and nervous diseases was that the long continued use of intoxicants may result in a breaking down or destruction of the brain and nerve cells so as to produce a permanent derangement of mind, that is, permanent or general insanity. Plaintiff's evidence however fails to establish that such condition existed as to the insured on or prior to September 1, 1927, when the change of beneficiary was made. The testimony does show frequent and prolonged spells of drunkenness in 1926 and in 1927, prior to September 1, but the witnesses very generally agreed, in substance, that when sober Fendler was an intelligent business man, transacting business and carrying on the ordinary affairs of life in a sane and normal manner. The numerous instances related of violence and abnormal conduct occurred only when he was intoxicated. On May 20, 1927, he was adjudged by the probate court to be of unsound mind and committed to a State Hospital. It appears from a reading of the testimony that he was not even then considered insane in fact and that the action taken was an expedient resorted to in an effort to check his career of drunkenness. The State Hospital records and the testimony of a member of the staff of that institution who examined Fendler and made a diagnosis of his condition both at the time of his admission and discharge, is to the effect, that he was not insane; that no permanent derangement existed; that he was not considered as insane when admitted and was normal, mentally, when discharged. The same court which adjudged Fendler to be of unsound mind on May 20, adjudged him to be sane on June 24, following whereupon he was discharged from the State Hospital and the legal presumption which arose from the adjudication of insanity was thereby dissipated and

the presumption of sanity restored. ■ The rule seems to be that if general insanity is admitted or proved to exist it is presumed to continue and if a recovery or a lucid interval is alleged to have occurred the burden of proving such allegation is on the person making it. [32 C. J. 757.] If general or permanent insanity had been shown by plaintiff's evidence to have existed the burden would then have devolved upon defendant Josephine Roy to show either that Fendler had been restored to sanity at or prior to the change of beneficiary or that such act was done in a lucid interval. ■ But the insanity shown in the present case must be classed as temporary and occasional in character. It is defined in "Law of Insanity" by Smoot, page 33, in this way: "In addition to being, at times, stricken with madness through the agency of accident and disease, man's mind is sometimes clouded by his own deliberate folly, thus inducing a form of artificial, temporary insanity. The most frequent example, as well as the most ancient one, is that of intoxication through the intemperate use of alcoholic beverage." The burden of proof therefore, as already stated, rested upon plaintiff to show, by satisfactory evidence, that such insanity existed at the time the change of beneficiary was made.

The case was tried and determined, and treated by the parties and the trial court, as an equity suit; without so deciding we shall treat it as such. It is our duty to review, and pass upon the weight of, the evidence in an equity case on appeal and while we are not bound by the finding of the chancellor we do keep in mind his superior opportunity to weigh the testimony. The testimony of numerous witnesses is that for approximately two years prior to the date the change of beneficiary was made Fendler was habitually and periodically intoxicated. At such times reason and judgment seem to have been dethroned and his mental faculties impaired to such an extent as to incapacitate him, for the time being, from performing a legal act. ■ "Drunkenness existing to a degree such as will render a person incapable of understanding and appreciating the result of his acts will be recognized in civil matters and given the effect of legal insanity." [Law of Insanity, Smoot, p. 34.] "A drunkard is not incompetent, like . . . one generally insane. He is simply incompetent upon proof that, at the time of the act, his understanding was clouded, or his reason dethroned, by actual intoxication." [Wright v. Fisher, 65 Mich. 275, 32 N. W. 605.] Following the general rule applied to temporary insanity, or transitory mental derangement, the derangement of the mind produced by intoxication must be shown to have existed at the time of the transaction in question. The mere showing that a person had frequently theretofore become intoxicated is not sufficient. It will be remembered that on August 5, 1927, plaintiff refusing longer to live with Fendler as his wife left the home and with her children

took up residence at her mother's home, filed a suit for divorce on August 13, and the alienation suit August 25. They lived apart until a reconciliation was effected in April, 1928. The change of beneficiary was made September 1, 1927. ■ The writer does not recall the testimony of any witnesses stating they had seen or known of Fendler being intoxicated during the period from the separation in August to sometime in 1928 following the reconciliation in April of that year, except that of plaintiff. The witnesses for defendant on the other hand testify that Fendler abstained from the use of intoxicants and was consistently sober during that period. The plaintiff testified that frequently during the month of August after she went to live at her mother's home and during September Fendler came there intoxicated and conducted himself in a violent manner, cursed, called out vile epithets, smashed glass in the windows and damaged the porch banisters and that he was drinking heavily during that time; that he came to her mother's home in a drunken condition "in the evening" of August 31; that he came again during the evening of the following day, September 1, (defendant's evidence is that the change in beneficiary was executed early in the evening of September 1) and that he was insanely drunk at that time; that after remaining about the house for awhile, admission having been refused, he left but returned "about eleven-thirty" and was still intoxicated and acted in a violent manner. The testimony of defendant's witnesses presents a sharp conflict. The defendant Josephine Roy, her husband and the insurance agent testify that Fendler was at his father's home that evening and that he was sober. The defendant and her husband say he was not away from his father's home that night and that he was "absolutely sober." Arthur Fendler said his brother Michael was at his garage during the afternoon of that day and that he was sober. Josephine Roy, another sister Catherine, the brother Arthur and his wife, and the employer Donnegan all testify that from the latter part of August, 1927, until April, 1928, Michael Fendler pursued the path of sobriety. During the last days of August Michael was about the building which Donnegan was getting in readiness for use as an automobile agency. Donnegan says he was sober then. He accompanied his brother Arthur and wife and baby to the country for a visit with relatives and a hunting trip on September 3, remaining until September 5, and during that time he was sober and his conduct was natural and normal. On September 13, he went to work for Donnegan and continued in his employ until May 12, 1928, when Donnegan closed out his business. Donnegan placed him in charge of this agency. He managed the business, handled the collections, kept accounts, paid bills, sold automobiles and accessories. Donnegan says Michael was sober during the period beginning the latter part of August and continuing during the time he was in his employ. In August and September Michael

made and completed five automobile sales for his brother Arthur's agency. The insurance agent says Michael was sober at the times he transacted the business with him in connection with the loan on the policies and the change of beneficiary and that at such times he observed nothing unusual about Michael's conduct and that he acted in a normal manner.

Fendler's mental capacity at the time he executed the change of beneficiary is a question of fact in the determination of which we are confined to a review of the evidence as set out in the printed record. As we have pointed out there is a sharp conflict in the testimony of the witnesses as to conditions existing at the time, shortly prior and immediately subsequent to the making of the change of beneficiary. In such situation the credibility of the witnesses is an important factor. The trial chancellor saw the witnesses, heard their testimony and observed their demeanor and we are therefore disposed to accord much weight to the conclusions and findings of the trial court. General or permanent insanity not having been shown we do not think the plaintiff has sustained the burden of showing that at the time of the act in question Fendler was mentally incapable of comprehending and understanding the nature and effect of his act. It is said in McAllister v. Security Benefit Assn. (Mo. App.), 261 S. W. 343, that it requires no more mental capacity to make a valid change of beneficiary in a life insurance policy than it does to make a will. If the testimony of defendant's witnesses is accepted Fendler undoubtedly possessed requisite mental capacity to make a valid change of beneficiary. Upon our own review of the evidence and taking into consideration the conclusions and findings of the trial chancellor with his superior opportunity for weighing the testimony we must hold the change of beneficiary to be valid and affirm the judgment and decree of the trial court to that extent. ■ Equitable considerations however suggest and require a modification of the decree. The testimony on this phase is vague and incidentally crept into the record but suggests that, in equity, the plaintiff should be reimbursed out of the proceeds of the policies in amounts which it will be necessary for the trial court to yet ascertain by hearing further testimony as to that matter alone. The plaintiff, without stating the number of times or the amount of the premiums, testified that she had sometimes paid the premiums on these policies, in order to keep them in force, out of her personal funds which she had set aside originally as a savings account for her infant children. She also testified that when the policies lapsed she paid a fee or charge to have them reinstated, the amount is not stated, and we find a reference in the evidence to the effect that plaintiff paid and discharged a loan which Fendler had negotiated against the policies. If the plaintiff made payments to keep the policies alive and the face amount thereof intact then as between defendant and herself she is entitled

to be reimbursed and the trial court is directed to ascertain the facts in this respect and modify its decree to provide for reimbursement to the plaintiff, out of the proceeds of the policies, of such amounts, if any, so paid by plaintiff. The judgment and decree should be reversed and the cause remanded with directions to the trial court to proceed in conformity with this opinion and thereupon enter its judgment and decree adjudging the change in beneficiary to be valid and the defendant Josephine Roy entitled to receive the proceeds of the policies less such amounts, if any, found to have been paid by plaintiff as aforesaid, in which amounts the decree should require that plaintiff should be first reimbursed out of such proceeds. It is so ordered. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.